**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-cr-30155-MJR |
| | ) | |
| MARK SAMUELS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM & O R D E R**

**REAGAN, District Judge:**

**A. Introduction and Procedural Background**

On December 16, 2004, a federal grand jury returned an indictment charging Terry Samuels, aided and abetted by Mark Samuels, with possession of a firearm by a previously convicted felon, in violation of **18 U.S.C. §§ 922(g)(1)** and **(2)** (*See* Doc. 1). Terry Samuels plead guilty to the charged offense on August 12, 2005, and was sentenced on November 3, 2005 to 235 months imprisonment.

On October 7, 2005, Mark Samuels (Terry's brother)[1] appeared before this Court in order to plea guilty. However, this Court found his plea unacceptable because Mark refused to admit the "possession" requirement of the offense. On January 19, 2006, following a three-day trial, Mark was was found guilty by the jury of aiding and abetting a felon in possession, in violation of **18 U.S.C. § 922(g)(1).**

Following the rendering of the verdict, Mark orally moved for an extension of time

---

[1] For clarity, the Court will hereinafter refer to Mark and Terry Samuels by their first names.

in which to file his post-trial motions.  This Court granted that motion, and gave him until on or before February 23, 2006 to file post-trial motions (*See* Doc. 123).

On February 23, 2006, Mark timely filed his motion for a new trial (Doc. 130) and memorandum in support (Doc. 131).  On April 7, 2006, the Government filed its response (Doc. 141).  On May 4, 2006, this Court held a hearing on this motion, allowing the parties to present argument and additional evidence on these issues (*See* Doc. 145).  Mark's motion for acquittal or new trial having been fully briefed and argued, the Court now rules thereon, beginning with a factual overview and a reference to the legal standards governing his arguments.

**B. <u>Summary of Facts</u>**

In late September or early October 2004, Stephen Perkins purchased a firearm, a .45 caliber Glock pistol, from his cousin Mark Samuels. At the time Mark sold Perkins this Glock, he showed Perkins another gun, but refused to sell it to Perkins, telling Perkins that this gun was registered to him. Mark kept this gun, an FEG, Model FP9, .9mm semi-automatic pistol, bearing serial number F36780, in his bedroom closet.  Perkins, unbeknownst to Mark, subsequently sold the Glock to another person.  In early October 2004, Mark began repeatedly calling Perkins' mother and grandmother to reach Perkins so that he could get the Glock back from him. Mark's attempts to reach Perkins were unsuccessful.

On October 13, 2004, Mark contacted his cousin, Katraelyus Franklin, and asked Franklin to take him to find Perkins because Franklin knew where Perkins "hung out." Franklin agreed.  Mark arrived to meet Franklin with his two brothers, Terry[2] and Marlon Samuels. Mark

---

[2]

At trial, the Government produced evidence that Terry Samuels had been convicted of the offense of being a felon in possession of a firearm.  Specifically, the Government presented the testimony of Detective Gary Becker on this point, and introduced a certified copy of Terry

brought his FEG firearm[3] with him.

While searching for Perkins, the four men first went to a house where Perkins was living, but Perkins was leaving as they pulled up. The men then followed Perkins to the County Line Liquor Store in Cahokia, Illinois, and there confronted him.

As this Court and the jury later learned throughout the course of Mark's trial, that meeting marked the beginning of a contemptible set of events that centered on Mark, Terry, and others repeatedly threatening and beating Stephen Perkins, apparently in an attempt to coerce him into returning Mark's gun. In his memorandum in support of the motion presently before the Court, however, Mark asserts that "[t]he only real issue [in the] instant cause [is] whether Mark Samuels aided and abetted Terry Samuel's possession of a firearm" (Doc. 131). Accordingly, this Court will focus on those facts *directly* relevant to those issues, and need not delineate each sordid detail composing the story of that evening.

At trial, Perkins testified that he saw Mark hand what he believed to be a gun to Terry Samuels as the two men approached him on the parking lot of the liquor store. Specifically, Perkins testified on direct that he "noticed Mark turn around to give Terry the gun when [he] was walking towards them" (Trial Transcript ["T.Tr."], p.8). He further stated, "I watched when Mark pulled up, I watched him go into his pants and pull something out I reflected as a gun, turned around and hand

_____

Samuels' prior conviction for Reckless Discharge of a Firearm in 1998.

In addition, the Government also presented evidence, through Samuels' own post-arrest statement, that he knew or had reason to believe Terry Samuels was a convicted felon on the night of October 13, 2004.

[3]   The Government presented evidence that the FEG had traveled in interstate commerce prior to Terry Samuel's possession of it on October 13, 2004, through the testimony of ATF Special Agent Daniel Owens.

3

it to [Terry]." *Id.* at 13.  Notably, upon redirect, Stephen Perkins admitted that he did not "see for a fact" what Mark handed to Terry. *See id.* at 71.  Nonetheless, the Government presented a significant amount of additional evidence to corroborate Perkins' belief that what he saw passed from Mark to Terry was in fact a firearm.

For example, the Government presented witness Sagar Gade, the owner of County Line, who testified that he observed this same incident, and saw the butt of a gun protruding from Terry's pocket as he approached Perkins, and witnessed Terry using what appeared to be a gun to lead Perkins into the van.

In addition to Gade's testimony, the Government displayed a surveillance-video recording that twice showed Terry Samuels walking closely behind Perkins, with his arm partially obscured and held to Perkins' back, while leading Perkins both to the side of the building and to the van.  The video also displayed that Gade's view of Terry and Perkins as they walked to the side of the building and into the van was relatively unobstructed.

After confronting Perkins at County Line, the four men took him with them in Franklin's van to find Mark's gun, which Perkins had told him was in his cousin's car in Belleville.  According to Perkins, while driving to Belleville, he spotted Belleville police officers standing outside a substation.  Perkins attempted to signal the officers, but was unable to do so because of the van's tinted windows.  According to Perkins' testimony at trial, Terry saw his attempt to signal the police officers and became very angry, striking Perkins several times with his fists and at least once with the gun he had been holding on him.

In addition, according to Perkins' testimony at trial, later on in the evening, when the men noticed the police following them, Mark again gave Terry the FEG – which Mark had regained

4

possession of – and told him to "take off" with it.  Specifically, Perkins testified, "Mark handed Terry both the gun and told him to take off running" (T. Tr. p. 27).  Moreover, during cross examination, counsel for Mark asked Perkins the following question: "Mark hands Terry a gun and tells him to run off with it?" (T.Tr. p. 59).  Perkins responded "yes," to this questioned and was not further cross-examined regarding his testimony on that point. *Id.*

After Mark handed Terry the gun, according to Perkins, the men drove around an abandoned building to allow Terry to exit the van with the gun. Perkins' testimony on this point was corroborated by evidence that the firearm was eventually recovered from inside a planter box, where it would have been extremely unlikely for it to have landed if thrown from a moving van as Mark had asserted in his post-arrest statement.

Upon these facts, the Government asserted two theories of Mark's guilt of aiding and abetting a felon in possession of a firearm: (1) that Mark handed Terry his FEG that night, based on Perkins's testimony, other witness's testimony and the surveillance video, and (2) that Mark knowingly associated and participated in Terry's criminal activity by setting events in motion that night with the intent and expectation that Terry would possess the firearm when the men confronted Perkins about the Glock.

In his defense, Mark admitted that he brought the FEG with him that evening, and admitted that Terry had used it that night.  However, Mark argued, he never handed the gun to Terry, did not knowingly associate with Terry's criminal activity, and took his gun back from Terry as soon as he realized that Terry was using it.[4]

---

[4]    Notably, Mark did not testify at trial.  However, his post-arrest video-taped statement was played for the jury.

Before deliberating, the jury was instructed that to find Mark guilty of the offense of aiding and abetting the possession of a firearm by a previously convicted felon, the Government had to prove the following elements beyond a reasonable doubt:

**First,** that, prior to October 13, 2004, Terry Samuels had been convicted of a crime that was punishable by a term of imprisonment of more than one year;

**Second,** that on October 13, 2004, Terry Samuels knowingly possessed a firearm; and

**Third,** that the firearm possessed by Terry Samuels had traveled in interstate commerce prior to his possession of it on that date;

**Fourth,** that the defendant knowingly aided and abetted Terry Samuels in the commission of the offense of unlawful possession of a firearm by a previously convicted felon; and

**Fifth,** that the defendant know [sic] or had cause to believe that Terry Samuels was a convicted felon when he aided and abetted the commission of this offense.

**Government's Suggested Jury Instruction # 17 (given over the defendant's objection).**

Ultimately, the jury rejected Mark's defense and found him guilty of the charged offense.

## C. Analysis

In his post-trial motion, Mark asks this Court to enter a judgment of acquittal or, in the alternative, order a new trial (Doc. 130).  The Court will consider each request in turn.

### *Mark Samuels' Motion for Judgment of Acquittal*

FEDERAL RULE OF CRIMINAL PROCEDURE 29(c) governs motions for judgment of acquittal made following a jury verdict.  A motion for judgment of acquittal should be granted only where there is insufficient evidence to sustain the conviction. *U.S. v. Galati*, **230 F.3d 254, 258 (7th**

Cir. 2000); *United States v. Jones*, 222 F.3d 349, 351-52 (7th Cir. 2000).

In considering the sufficiency of the evidence, the Court views the evidence in the light most favorable to the Government and overturns a conviction only "if the record contains no evidence on which a rational jury could have returned a guilty verdict." *U.S. v. O'Hara,* 301 F.3d 563, 569-70 (7th Cir. 2002). *Accord United States v. Duprey*, 895 F.2d 303, 310 (7th Cir. 1989)(evidence and inferences are viewed in the light most favorable to the government). Additionally, in assessing the sufficiency of the evidence, the Court may not re-weigh the evidence or judge the credibility of the witnesses. *U.S. v. Berchiolly,* 67 F.3d 634, 637 (7th Cir. 1995). "As long as there is a reasonable basis in the record for the jury's verdict, it must stand." *Galati*, 230 F.3d at 258, *citing Dallis v. Don Cunningham & Assocs.*, 11 F.3d 713, 715 (7th Cir. 1993).

As the Court has delineated *supra*, the Government presented a significant amount of evidence at trial showing that Mark handed his gun to Terry as the men approached Perkins at the County Line liquor store. Although Perkins admitted that he did not "know for a fact" that it was a *gun* he saw passed by Mark to Terry, Perkins' belief that the object was in fact a firearm was corroborated by the eyewitness testimony of Gade, the liquor store surveillance video and other events occurring later that evening.

Moreover, later on in his testimony, Perkins again asserted having seen Mark pass the gun to Terry: "Mark handed Terry ... the gun and told him to take off running" (T. Tr. p. 27). Perkins was consistent on this point during cross-examination, and was not otherwise challenged on this portion of his testimony. On a sufficiency of the evidence review, this Court may not judge the credibility of the witnesses. *See Berchiolly,* 67 F.3d at 637. Viewed in the light most favorable to the Government, this evidence provided a reasonable basis for the jury's verdict. *Id.* This Court

cannot say that the record "contains no evidence on which a rational jury could have returned a guilty verdict." *See O'Hara,* 301 F.3d at 569-70. Accordingly, the Court **DENIES** Samuels' motion for judgment of acquittal.

### *Mark Samuels' Motion for a New Trial*

A different standard governs motions for new trials in criminal cases. FEDERAL RULE OF CRIMINAL PROCEDURE 33 provides that, upon a defendant's motion, the Court may vacate any judgment and grant a new trial, "if the interest of justice so requires." In considering a motion for new trial, the Court does not view all the evidence in the light most favorable to the Government. Rather, the Court may properly consider the credibility of the witnesses and "may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *U.S. v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). Stated another way, the focus in a new trial motion is on whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses. *Id.*

In the case at bar, Mark argues that he should receive a new trial because the Government argued facts not in evidence during its closing statement. The Seventh Circuit employs a two-step analysis when evaluating claims that a prosecutor stated facts not in evidence in its closing argument. *United States v. White*, 222 F.3d 363, 369 (7th Cir. 2000). First, courts are to "examine the challenged remarks in isolation to determine whether they were improper." *Id.* If a court finds that the statements are improper, then it examines the prosecutor's remarks "in light of the entire record to determine whether they could have prejudiced the jury that the defendant can not be said to have received a fair trial." *Id.*

In determining whether a prosecutor's remarks prejudiced a defendant, the Seventh

8

Circuit suggests that courts consider five factors: (1) the nature and seriousness of the prosecutorial misconduct, (2) whether the prosecutor's statements were invited by impermissible conduct by defense counsel, (3) whether the trial court instructed the jury to disregard the statements, (4) whether the defense was able to counter the improper arguments through rebuttal, and (5) the weight of the evidence against the defendant. ***Id. at* 370-71.**

Mark asserts that the Government argued facts that were not in evidence in relation to two issues: (1) statements regarding purported blood found on the parking lot of a nursing home and in Franklin's van, and (2) Perkins' testifying having seen Mark passing a gun to Terry while in the parking lot of the liquor store. The Court considers each issue in turn.

### *The Government's Statements Regarding Blood in the Parking Lot and Van*

Mark argues that during closing arguments by the Government, the Government made statements referring to "blood" found on the parking lot at the nursing home and in the van even though there was no testimony at trial that any of the "blood-like substances" observed in the van or on the parking lot of the nursing home were tested by an expert. (Doc. 131, p. 3).

Reviewing the transcript of the Government's closing argument, this Court notes that the Government did assert that a photograph showed "blood inside of the van ... [b]lood in the parking lot" (Government's Closing Argument Transcript ["Cl. T."], p. 13). However, as the Government admits in its response to Mark's motion, "no evidence had been introduced at trial that the substances found in these areas were in fact blood" (Doc. 141, p. 15).

"Argument referencing facts not in evidence is clearly improper." ***White,* 222 F.3d at 370.** In referring to the "blood-like substance" as "blood," the Government, strictly speaking, *was* referencing facts not in evidence. Accordingly, this Court finds that the Government's statements

on this issue were improper.

Nonetheless, it is clear to this Court that the Government's comments regarding the "blood like substance" were not meant to be deliberately misleading. Although no testing confirmed the substance was in fact blood, a reasonable jury could have concluded it was a blood given Perkins' description of his injuries and the location where they occurred as well as his time spent in the van. Moreover, the question of whether the substance was indeed blood is relatively immaterial in this matter. And, nevertheless, it is very unlikely that these statements would mislead the jury, as the fact that these substances had not been analyzed to determine whether they were in fact blood had been repeated throughout the trial. Accordingly, the nature and seriousness of these improper statements is slight.

In addition, when the Government made comments regarding the "blood in the van" in its rebuttal, defense counsel objected. In ruling on this objection, this Court took the opportunity to remind all the parties and the jury that "the jury knows what the evidence was and what it was not" (Cl. T. at 13).

This Court's reminder to the jury was intentionally brief for three reasons: (1) to avoid invading the province of the jury through a ruling that signaled to the jury the Court's belief that the substance was or was not blood; (2) to avoid unduly disrupting a party's closing statement, and (3) to avoid further belaboring a point upon which this Court had repeatedly instructed the jury – that statements made by the attorneys were not evidence. In fact, in addition to this Court's brief reminder during the Government's closing, this Court thoroughly instructed the jury on this point. In its initial instructions to the jury, for instance, this Court instructed the jury that "[s]tatements, arguments, and questions are not evidence." *See* **Court's Initial Instruction # 2.** Moreover, at the

conclusion of the evidence, this Court again instructed the jury that "the lawyers' statements to you are not evidence ... if the evidence as you remember it differs from what the lawyers said, your memory is what counts." ***See* Government's Suggested Jury Instruction # 6 (given without objection).**  This Court presumes that the jury obeyed these instructions. ***See United States v. Robinson,* 161 F.3d 463, 470 (7th Cir. 1998)(stating that the Seventh Circuit presumes that juries obey limiting instructions).**

"In light of the entire record," this Court **FINDS** that the Government's statements regarding "blood" in the van and parking lot could *not* "have prejudiced the jury that [Samuels] can not be said to have received a fair trial," ***see White*, 222 F.3d at 369,** and does *not* warrant a new trial.

### *The Government's Statements Regarding Perkins' Testimony*

Finally, Mark argues that the Government relied upon facts not in evidence when it stated that Perkins testified that he saw Mark hand Terry a gun at County Line liquor store.  During closing, the Government stated that "Stephen Perkins also testified that Mark Samuels handed Terry Samuels the gun and told him to go to the van ...." (Cl. Tr., p. 5).

While testifying on direct, Perkins first stated that, while in the liquor store parking lot, he "noticed Mark turn around to give Terry the gun when [he] was walking towards them" (T. Tr., p.8). However, he later backed off of this testimony somewhat, stating "I watched when Mark pulled up, I watched him go into his pants and pull something out I *reflected* as a gun, turned around and hand it to [Terry]."  *Id.* at 13 (emphasis added).  And, upon redirect, Perkins admitted that he did not "see for a fact" what Mark handed to Terry while in the parking lot of the liquor store. *See id.* at 71.

11

In light of Perkins' later clarification that he had *not* actually seen a gun being passed passed from Mark to Terry while in the parking lot – but rather what he *thought* was a gun, the Government's statements on this point were improper in that they referenced facts not in evidence. ***White,*** **222 F.3d at 370.**

In addition to that statement, Mark also points out that the Government later referred to Perkins' testimony as being "that Mark Samuels handed a gun to Terry Samuels on at least *two* occasions" (Cl. Tr., p. 16)(emphasis added).  Although Perkins' testimony that he had seen Mark hand Terry a gun *while in the van* was consistent, he later admitted that he wasn't sure that what he saw passed from Mark to Terry while they were in *the parking lot* was in fact a gun.  Accordingly, the Government's statement on this point, *very* strictly speaking, referenced facts not in evidence and was therefore improper. ***White,*** **222 F.3d at 370.**

The Government's improper statements on this point are relatively more egregious than those concerning the purported "blood in the van."  The overall weight of evidence in this case was relatively slight, and as the Government's second statement was made during its rebuttal, Mark did not have the opportunity to address the improper characterization of that portion of Perkins' testimony.  Moreover, the passing of the gun from Mark to Terry is a matter that is highly material to this case.

Nonetheless, as this Court has already mentioned, the Court carefully instructed the jurors *several* times throughout the course of the trial that they were not to consider the attorney's statements as evidence, and they were to rely upon their own memories of witness testimony.

In addition, although Perkins did later admit that he had not seen "for a fact" that what was passed from Mark to Terry was a gun, the Government presented a significant amount of evidence – Gade's testimony, the surveillance video, and other events happening later that evening – to corroborate its theory that what Perkins had seen *was* in fact a gun. And, most significantly,

Perkins' assertion that Mark handed Terry the gun while the two men were in the van was consistent and corroborated by the gun's ultimately being found in a location where it would be been almost impossible for it to have been tossed from the window of the van.

In light of this Court's instructions and the significant amount of other evidence in this case, this Court cannot conclude that the Government's mischaracterization of Perkins' testimony on these issues could have prejudiced the jury to the extent that Samuels cannot be said to have received a fair trial. *See White*, **222 F.3d at 369**.

Having reviewed the entire record of this case, as well as Samuels' arguments for a new trial, the Court **FINDS** that the jury's verdict in this matter was *not* "so contrary to the weight of the evidence that a new trial is required in the interest of justice." *See Washington*, **184 F.3d at 657.** Accordingly, pursuant to FEDERAL RULE OF CRIMINAL PROCEDURE 33, the Court **DENIES** Samuels' motion for a new trial (Doc. 130).

**IT IS SO ORDERED.**

**DATED this 22nd day of June, 2006.**

<u>s/ Michael J. Reagan</u>
**MICHAEL J. REAGAN**
**United States District Judge**